Filed 3/5/14  In re S.B. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re S.B., a Person Coming Under the Juvenile Court Law. | B247833, B250138 (Ventura County Super. Ct. No. J068923, Los Angeles County Super. Ct. No. CK78619) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. MARY B., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  D. Zeke Zeidler, Judge.  Conditionally reversed and remanded with directions.

Lisa A. Raneri, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, Stephen D. Watson, Deputy County Counsel, for Plaintiff and Respondent.

_____

In this dependency case (Welf. & Inst. Code, § 300 et seq.),[1] Mary B. (Mother) appeals from the order terminating her parental rights to her then 10-month-old daughter, S.B. Mother contends we must reverse the order because (1) she did not receive proper notice of the section 366.26 hearing and (2) the juvenile court erred in finding the Los Angeles County Department of Children and Family Services (DCFS) complied with the notice requirements of the Indian Child Welfare Act (ICWA; 25 U.S.C. § 1901 et seq.). With respect to her contention regarding notice, Mother argues DCFS failed to exercise reasonable diligence in attempting to locate her and should have provided notice of the section 366.26 hearing to her parents (S.B.'s maternal grandparents). We reject Mother's challenge regarding notice. We agree with Mother's contention—and DCFS concedes on appeal—that the juvenile court erred in finding DCFS complied with the notice requirements of the ICWA. Accordingly, we conditionally reverse the order terminating parental rights and remand for the limited purpose of allowing the juvenile court to comply with the notice provisions of the ICWA.

## BACKGROUND

The Ventura County Human Services Agency (the Agency) received a referral about S.B. from the staff at the hospital where she was born. As stated in the Agency's Emergency Response Report, nursing staff at the hospital reported Mother displayed paranoid behavior, was antsy and had a hard time following directions, did not appear to know how to care for an infant although she stated she had two other children, and was evasive in answering questions about herself. Mother told hospital staff she had been staying with a friend near the hospital in Ventura County, but she planned to take a taxi to Pasadena with S.B. The Emergency Response Report lists an Altadena address for Mother and includes a telephone number which the Agency stated was not a working number. After Mother reluctantly provided an alternate last name, the Agency discovered Mother had two open dependency cases in Los Angeles County involving her

---

[1] Further statutory references are to the Welfare and Institutions Code.

2

other children, with allegations regarding her chronic mental health issues. When the hospital discharged S.B., the Agency placed the newborn in foster care.

On July 5, 2012, the Agency filed a dependency petition under section 300, subdivisions (b) and (g), involving S.B. (Case No. J068923). The Agency alleged in the petition that Mother has a history of mental and emotional problems, including bipolar disorder, depression and schizoaffective disorder, "which periodically render her unable to provide adequate care for the child" (count b-1). The Agency also alleged that S.B.'s half siblings, M.B. and E.B., "were made dependents of the Juvenile Court in Los Angeles County due to the mother's mental health issues" and Mother had not "made reasonable efforts to treat the problems which led to the removal of the half-sibling[s]" (count b-2). The petition states that the juvenile court in Los Angeles County terminated Mother's reunification services in M.B.'s case in March 2011 and terminated Mother's reunification services in E.M.'s case in October 2011. The Agency further alleged in the petition that the identity and whereabouts of S.B.'s father were unknown and he had not visited or provided care or support to S.B. (count g-1).

Mother appeared at the detention hearing in Ventura County on July 6, 2012, and the juvenile court appointed counsel to represent her. The court found a prima facie case existed for detaining S.B. from Mother. The court also found the ICWA may apply.

The Agency prepared a jurisdiction report, dated July 31, 2012, with several attachments including a July 1, 2012 letter from a person named Brianna W. In the letter, Brianna explained she had agreed to allow Mother and her children to live in Brianna's three-bedroom house located on West Howard Street in Pasadena. Brianna provided a telephone number, stating she could be reached at that number to answer questions about the arrangement. The Agency stated in the jurisdiction report that the ICWA does or may apply, listing S.B.'s potential tribal affiliation as Cherokee Nation and Eastern Band of Cherokee Indians.

On August 1, 2012, the Agency sent the ICWA notice (form ICWA-030) by certified mail with return receipt requested to Mother at the Altadena address, to the Sacramento Area Director of the BIA, to the Secretary of the Interior, to the Cherokee

3

Nation, to the Eastern Band of Cherokee Indians, and to the United Keetoowah Band of Cherokee Indians. In the notice, the Agency listed Mother's name as Mary B[.], but did not list the alternate last name she had provided while at the hospital (O[.]), which she indicated was her "legal name." The ICWA notice lists the names of S.B.'s maternal grandmother and maternal great-grandmother, but does not include their maiden names.

On September 25, 2012, the juvenile court in Ventura County held the jurisdiction hearing and sustained the allegations in the dependency petition set forth above. The court declared S.B. a dependent of the court, ordered her placed under the supervision of the Agency, and transferred the matter to Los Angeles County for disposition.

On October 17, 2012, the juvenile court in Los Angeles County accepted transfer of the case (Case No. CK78619), and set the disposition hearing for November 7, 2012.

DCFS prepared a disposition report for the November 7, 2012 hearing, noting that S.B. was still placed with a foster family in Ventura County. DCFS listed Mother's address as the West Howard Street address in Pasadena referenced above. DCFS sent notice of the November 7, 2012 disposition hearing to Mother at that address. DCFS listed Mother's telephone number as the number the Agency had previously found was not a working number, as discussed above. Mother had not provided information on the identity of S.B.'s Father so DCFS could not conduct a search for him.

DCFS stated in the disposition report that the ICWA does or may apply. DCFS attached to the report letters from the Cherokee Nation, the Eastern Band of Cherokee Indians, and the United Keetoowah Band of Cherokee Indians stating the tribes would not intervene in this matter based on the information DCFS had provided in the ICWA notice. The August 16, 2012 letter from the Cherokee Nation includes a list of names and aliases of S.B.'s relatives, including the maiden names of S.B.'s grandmother and great-grandmother. The Cherokee Nation used the information DCFS provided in the ICWA notice to trace S.B.'s maternal ancestry. The letter from the Cherokee Nation lists a woman named Edna M[.] as S.B.'s great-great-grandmother. Edna M[.] is listed on the final roll of the Eastern Band of Cherokee Indians of North Carolina, prepared by United

4

States Agent Fred A. Baker, pursuant to an act of the 68th Congress, (43 stat., 376), June 4, 1924 (the 1924 Baker Roll).[2]

DCFS also stated in the disposition report that the dependency investigator made contact with Mother by telephone on October 30 and November 1, 2012, for purposes of scheduling an interview for the report, but Mother refused to make herself available for an interview. The investigator was able to reach Mother using the cell phone number Mother provided, which the Agency previously had found was not a working number.

As set forth in the disposition report, S.B.'s maternal grandparents informed DCFS they would like to have S.B. placed in their home in Illinois with a permanent plan of adoption. The maternal grandparents were in the process of adopting S.B.'s half sister, M.B. (age 2). S.B.'s half brother, E.B. (age 3), had been adopted by non-relatives. The maternal grandparents informed the dependency investigator that they "limit their interaction with" Mother due to Mother's anxiety and anger. According to the disposition report, the maternal grandparents stated "they do not have any updated information as to mother's current mental health status, but they can only guess that she hasn't done anything to improve her situation based on mother calling to rant and rave about the world being against her. Maternal grandparents state that they wish things were different and that they are uneasy about mother's ability to care for S[.B.]" DCFS recommended the juvenile court not offer Mother reunification services because her parental rights to S.B.'s two half siblings had been terminated after Mother failed to comply with court orders regarding her mental health issues, including an order for a psychological evaluation which Mother did not complete.

Mother appeared at the November 7, 2012 hearing, and the juvenile court appointed counsel to represent her. Mother filled out and signed the Parental Notification of Indian Status form (ICWA-020), indicating she may have Cherokee Indian ancestry

---

[2] On September 23, 2013, this court granted Mother's unopposed September 16, 2013 request for judicial notice, attaching materials demonstrating Edna M[.] is listed on the 1924 Baker Roll.

from a band "possibly" located in Oklahoma. Mother also filled out and signed a Notification of Mailing Address form, listing her address as the West Howard address in Pasadena that Brianna W. had identified in her July 1, 2012 letter discussed above. Mother listed her telephone number as the cell phone number at which the dependency investigator had reached Mother on October 30 and November 1, 2012. The form instructed the parent to inform DCFS or the court of any change in mailing address. During the hearing, Mother informed the juvenile court her mailing address was not the West Howard address listed on the Notification of Mailing Address form she submitted earlier that day, but was a post office box in Pasadena. Mother stated the post office box address on the record. Mother told the court she was unable to provide a name or contact information for S.B.'s father.

Also at the November 7, 2012 hearing, the juvenile court made findings under the ICWA. The court noted that on December 22, 2010, in dependency proceedings involving S.B.'s half sibling, the juvenile court found the ICWA did not apply. Mother requested additional "time to trace the [Indian] ancestry." She explained that an "American Indian activist"—a person with whom the court was familiar—was assisting her. The court declined to grant Mother additional time. In making its findings in this case, the court stated: "The court finds that the ICWA notice is proper and complete. There has been no new information from the Mother subsequent to December 20th [*sic*] of 2010. [¶] In addition, the Agency in Ventura County did new ICWA notices, and all of the tribes have responded indicating that the children are not eligible for membership based upon the information available. [¶] The court does not have reason to know or believe the child is an Indian child as defined by the Indian Child Welfare Act. The Indian Child Welfare Act does not apply."

The juvenile court continued the disposition hearing to January 2, 2013, and ordered Mother back to court on that date. The court explained to Mother that it could proceed without her if she did not return to court and "could deny [her] services and go directly to a permanent plan that could even include adoption." The court ordered DCFS to provide reunification services to Mother in the interim as well as a "detailed written

6

visitation schedule." Counsel for DCFS and Mother asked the court to order that Mother be interviewed by DCFS prior to the continued disposition hearing, but the court stated it would not make such an order because an interview of Mother at this stage of the proceedings was unnecessary.

In a last minute information for the court, dated January 2, 2013, DCFS informed the juvenile court that Mother had not had any visits with S.B. since October 2012. On November 19 and December 3, 2012, DCFS sent Mother information regarding visits by certified mail. On November 9, 2012, DCFS sent Mother counseling referrals by certified mail to the post office box address Mother had provided during the November 7, 2012 hearing. Also on November 9, 2012, the dependency investigator called Mother at the cellular telephone number Mother had provided, but the number was disconnected. On November 16 and November 30, 2012, the dependency investigator called Mother at the same number and it was working, but the investigator could not leave a message because Mother's voice mail box was full. DCFS believed Mother was trying to "evade" DCFS. DCFS continued to recommend the court not offer Mother reunification services.

Mother did not appear at the continued disposition hearing on January 2, 2013 even though the juvenile court had ordered her to return during the previous hearing at which she was present. Mother's counsel requested the court continue the hearing because he had been unable to reach Mother since the last court date. The court denied counsel's request, noting the disposition hearing already had been continued from November 7, 2012 at Mother's counsel's request. Mother's counsel requested the court order reunification services for Mother. S.B.'s counsel joined DCFS's request that the court not offer Mother reunification services. The court removed S.B. from Mother and denied reunification services. The court noted that Mother's reunification services and parental rights had been terminated in the dependency proceedings involving E.B. and M.B. The court further explained: "The Mother has not subsequently made a reasonable effort to treat the problems that led to the removal of the . . . half-siblings from her. [¶] The court cannot find by clear and convincing evidence that it is in the best interest of

this child to grant the mother reunification services. The mother's denied reunification services under [section] 361.5(b)(10) and (b)(11)."

At the January 2, 2013 disposition hearing, the court also ordered an expedited Interstate Compact on the Placement of Children regarding S.B.'s potential placement with the maternal grandparents in Illinois. The court set the section 366.26 hearing for May 2, 2013, finding a possibility of guardianship or adoption for S.B. The court ordered DCFS to provide notice to Mother of her right to file a writ petition at the post office box address in Pasadena. The court also set a hearing for February 13, 2013 on the de facto parent request S.B.'s foster parents had filed in November 2012.

On January 4, 2013, DCFS served the January 2, 2013 minute order and the requisite notice regarding the right to file a writ petition on Mother at the post office box address in Pasadena. On January 28, 2013, DCFS served notice of the February 13, 2013 hearing on Mother at the post office box address in Pasadena and at the street address in Altadena that Mother had provided at the outset of these dependency proceedings.

In a supplemental report, dated February 13, 2013, DCFS stated it had been unable to reach Mother by telephone or mail, and Mother had not contacted DCFS regarding visitation with S.B. DCFS also reported that S.B.'s maternal grandparents in Illinois had withdrawn their request to adopt S.B. and informed DCFS they believed it would be in S.B.'s best interest to be adopted by her foster parents. The foster parents told DCFS they wanted to adopt S.B. and maintain an open relationship with her maternal grandparents (who were adopting M.B.) and the family who had adopted E.B. On February 13, 2013, the juvenile court granted the foster parents' de facto parent request.

On February 15, 2013, Mother filed a Notice of Appeal in this matter, stating she was appealing from the termination of her parental rights (which had not occurred yet) and the termination of "'services.'" Mother listed an address for herself on West Howard Street in Pasadena, although she crossed out the street number she had previously provided to DCFS and the juvenile court and listed a different street number on West Howard Street. Mother also listed the cellular telephone number she had previously provided to DCFS and the court.

8

On February 25, 2013, the juvenile court advanced and vacated the section 366.26 hearing and set it for May 9, 2013.

In the section 366.26 report, dated May 2, 2013 and prepared on or about April 9, 2013, DCFS stated it had been unable to locate Mother. DCFS found the address on West Howard Street in Pasadena that Mother had initially provided to DCFS and the juvenile court (and that Brianna W. had listed in her July 1, 2012 letter) was a vacant home. Voice mail messages could not be left at the cellular telephone number Mother had provided to DCFS and the juvenile court, and an automated outgoing message stated the person called was unavailable. DCFS planned to conduct a field visit to the alternate address on West Howard Street that Mother had listed on her February 15, 2013 Notice of Appeal.

A Declaration of Due Diligence DCFS prepared on or about April 25, 2013 and submitted with the section 366.26 report states that DCFS found the post office box in Pasadena that Mother had provided as her mailing address was closed and Mother's "name was not found on file." On April 24, 2013, a DCFS adoptions assistant made visits to both addresses on West Howard Street that Mother had provided. At the first address Mother had provided, and Brianna W. had listed in her July 1, 2012 letter, the assistant spoke to a resident who had recently moved in and stated she had sent back mail addressed to Mother because Mother did not live at that address. At the alternate West Howard Street address Mother had listed on her Notice of Appeal, the assistant found a vacant home. The 12-page Declaration of Due Diligence details all the various searches DCFS conducted to locate Mother (e.g., U.S. Postal Service, California Department of Motor Vehicles, LexisNexis, etc.).

DCFS also stated in the section 366.26 report that Mother had not contacted DCFS to check on S.B.'s welfare or to request visits since the case was transferred to Los Angeles County in October 2012. DCFS recommended the juvenile court terminate Mother's parental rights upon approval of the adoption home study of S.B.'s foster parents. DCFS attached to the report the notice of the May 2, 2013 section 366.26

hearing it had served on Mother on February 7, 2013 by certified mail with return receipt requested at the address of her counsel.

On May 2, 2013, DCFS submitted a last minute information for the court stating the adoption home study of S.B.'s foster parents had been approved. The juvenile court held a hearing on May 2, 2013, even though it previously had vacated the May 2, 2013 section 366.26 hearing and set the matter for May 9, 2013, because the section 366.26 hearing had been noticed for May 2, 2013. DCFS's counsel informed the court that, before she could represent notice to Mother was proper, she needed to verify whether Mother was receiving mail at the alternate West Howard Street address even though DCFS found the home to be vacant. The court ordered DCFS to update its Declaration of Due Diligence regarding its search for Mother in advance of the May 9, 2013 hearing.

On May 9, 2013, DCFS submitted an updated Declaration of Due Diligence regarding its search for Mother. The declaration states an adoptions assistant visited the alternate West Howard Street address on May 8, 2013, and spoke to a resident who had moved in two weeks before. The resident confirmed Mother did not live at that home.

At the outset of the section 366.26 hearing on May 9, 2013, Mother's counsel stated: "I have no direction from my client. I have had no recent contact with her." Mother's counsel did not request a continuance of the hearing or argue that notice to his client was improper. Nor did he argue against termination of Mother's parental rights over S.B. The juvenile court found notice was proper, return of S.B. to her parents would be detrimental, and S.B. was adoptable. The court terminated parental rights.

On May 24, 2013, Mother's appellate counsel filed a Notice of Appeal from the orders made under section 366.26. The Notice of Appeal lists an address for Mother in Pacoima. This address is listed in DCFS's Declaration of Due Diligence. In April 2013, a DCFS adoptions assistant called a telephone number associated with this address and a resident informed her Mother did not live at that address.

10

## DISCUSSION

**Notice of Section 366.26 Hearing**

Mother contends her due process and statutory rights were violated because DCFS failed to exercise reasonable diligence in attempting to locate her and failed to provide notice of the section 366.26 hearing to S.B.'s maternal grandparents. Mother argues DCFS should have asked Brianna W. and S.B.'s maternal grandparents if they knew Mother's whereabouts or had contact information for her.

DCFS argues Mother forfeited this issue because her counsel did not make an objection below regarding improper notice of the section 366.26 hearing, which would have allowed the juvenile court to consider and address Mother's arguments before proceeding with termination of parental rights. (*In re Wilford J.* (2005) 131 Cal.App.4th 742, 754 ["defective notice and the consequences flowing from it may easily be corrected if promptly raised in the juvenile court"].) In her reply appellate brief, Mother does not dispute her counsel failed to preserve the notice issue for appeal by failing to object below. Nor does she argue her counsel rendered ineffective assistance in failing to raise such an objection. Instead, she asks this court to exercise its discretion and consider the issue (see *In re Wilford J.*, *supra*, 131 Cal.App.4th at p. 754 ["forfeiture is not automatic, and the appellate court has discretion to excuse a party's failure to properly raise an issue in a timely fashion"]) because she asserts "lack of notice of a hearing to terminate parental rights is of constitutional dimension and of great public interest."

We will exercise our discretion and consider the issue. As Mother points out, this is not a case in which a parent failed to raise a notice objection at subsequent hearings at which the parent was present. (See *In re Wilford J.*, *supra*, 131 Cal.App.4th at p. 754 ["Notwithstanding the juvenile court's error in proceeding with the unscheduled jurisdictional hearing, Wilford J. appeared with counsel at subsequent disposition hearings and had the opportunity during each one to challenge the court's earlier finding that notice had been properly given. He did not and thus deprived the juvenile court of the opportunity to correct the mistake. [Citation.] Accordingly, he has forfeited that issue on appeal"].) Here, Mother contends she did not receive proper notice of the

11

section 366.26 hearings and she did not have an opportunity to raise the issue at a subsequent hearing.

As discussed above, DCFS sent Mother notice of the May 2, 2013 section 366.26 hearing at the address of her counsel by certified mail with return receipt requested. (§ 294, subd. (f)(7)(A) ["If the court determines that there has been due diligence in attempting to locate and serve the parent and the probation officer or social worker recommends adoption, service shall be to that parent's attorney of record, if any, by certified mail, return receipt requested. . . ."].) DCFS did not send a subsequent notice to Mother at the address of her counsel of the continued May 9, 2013 section 366.26 hearing. Counsel did not know how to contact Mother. DCFS confirmed—and Mother does not dispute—that service could not be made on Mother at any of the addresses she had provided to DCFS and the juvenile court. Nor could Mother be contacted at the cellular telephone number she had provided.

Mother asserts DCFS should have contacted Brianna W. and S.B.'s maternal grandparents to determine if they were aware of Mother's whereabouts or had contact information for her. As discussed above, the Agency in Ventura County attached to its July 31, 2012 jurisdiction report a July 1, 2012 letter from Brianna stating she had agreed to allow Mother and her children to live in Brianna's three-bedroom house located on West Howard Street in Pasadena. An adoptions assistant made two visits to that home in April 2013, and first found it to be vacant and then found a new resident there who did not know Mother. Mother argues DCFS should have called the telephone number Brianna listed in her July 1, 2012 letter to see if Brianna was aware of Mother's whereabouts or had contact information for her. Given the July 1, 2012 letter is the only mention of Brianna in the record, we cannot agree with Mother's assertion that a telephone call to the number listed in the letter was a "likely means of locating" Mother in April or May 2013.

With regard to S.B.'s maternal grandparents in Illinois, Mother cites an excerpt from a DCFS report in a proceeding involving S.B.'s half sibling, dated November 18, 2010, one and one-half years before S.B.'s birth, in which DCFS reported Mother

12

"considers her relationship close to her parents and speaks to them about once a week by telephone." The same November 18, 2010 report states Mother had not seen her parents for about two years. In the disposition report in this matter, dated November 7, 2012, DCFS stated S.B.'s maternal grandparents informed the dependency investigator that they "limit their interaction with" Mother due to Mother's anxiety and anger. There is no indication in the record that Mother had seen the maternal grandparents since 2009, but there is evidence of at least one telephone call after the matter was transferred to Los Angeles County. There is no indication in the record that the maternal grandparents were aware of Mother's whereabouts or had contact information for her in April or May 2013. Nonetheless, we conclude DCFS had a statutory duty to send notice to S.B.'s grandparents regarding the section 366.26 hearing, as explained below.

Section 294, subdivision (a)(5), provides DCFS must give notice of the section 366.26 hearing to the "grandparents of the child, if their address is known and if the parent's whereabouts are unknown." Mother's whereabouts were unknown and DCFS knew the address of S.B's maternal grandparents. DCFS did not send notice of the section 366.26 hearing to the maternal grandparents. Thus, we cannot conclude notice of the section 366.26 hearing was proper.

We will reverse the order terminating parental rights for error in providing notice of the section 366.26 hearing only if the error was prejudicial. We reject Mother's assertion this error is structural requiring automatic reversal. "Unless there is no attempt to serve notice on a parent, in which case the error has been held to be reversible per se [citations], errors in notice do not automatically require reversal but are subject to the [*Chapman*] harmless beyond a reasonable doubt standard of prejudice." (*In re J.H.* (2007) 158 Cal.App.4th 174, 183; *In re Angela C.* (2002) 99 Cal.App.4th 389, 393-396; *Chapman v. California* (1967) 386 U.S. 18.) As discussed above, DCFS attempted to locate Mother for purposes of serving notice of the section 366.26 hearing and when its efforts failed, served notice of the May 2, 2013 hearing at the address of her counsel.

"The primary issue in a section 366.26 hearing is whether the dependent child is likely to be adopted." (*In re Angela C.*, *supra*, 99 Cal.App.4th at p. 395.) S.B.'s foster

13

parents, who had cared for her since shortly after her birth, wanted to adopt her and had an approved home study.  There is no dispute this 10-month-old was adoptable.  "We therefore find beyond a reasonable doubt that the error in notice was harmless as to the court's finding of [S.B.]'s adoptability."  (*Id*. at p. 396.)

"Once the court finds the likelihood of adoption, termination of parental rights is the preferred permanent plan absent proof that termination would be detrimental to the child's best interests.  [Citations.]  The court may find such detriment when a parent establishes that he or she has maintained regular visitation and contact with the minor and the minor would benefit from continuing the relationship."  (*In re Angela C.*, *supra*, 99 Cal.App.4th at p. 396, citing § 366.26, subd. (c)(1)(A).)  Mother does not argue she could establish this parent-child relationship exception to termination of parental rights.  She had not visited S.B. since the matter was transferred to Los Angeles County in October 2012, more than six months before the section 366.26 hearing.  Nor had she contacted DCFS since the case was transferred to discuss visitation or S.B.'s welfare.  "Thus, we can likewise find beyond a reasonable doubt that the error in notice was harmless to any detriment claim."  (*In re Angela C.*, *supra*, 99 Cal.App.4th at p. 396.)

Mother argues proper notice of the section 366.26 hearing would have provided her "the 'renewed' opportunity to seek reunification services by implementing the constitutional protections afforded by section 388."  We are confident the juvenile court would have denied a section 388 petition requesting a change in the order denying Mother reunification services.  Mother failed to appear at the January 2, 2013 continued disposition hearing at which the court denied her reunification services, even though the court had ordered her to be present during a prior hearing she attended.  Mother never contacted DCFS to discuss the mental health issues which led to S.B.'s removal.  There is nothing in the record indicating Mother had made or planned to make any effort to reunify with S.B.

Any error in providing notice to Mother of the section 366.26 hearing was harmless beyond a reasonable doubt.

14

## II. ICWA Notice

Mother contends the juvenile court erred in finding DCFS complied with the notice requirements of the ICWA. DCFS concedes the error and does not oppose a conditional reversal of the order terminating parental rights and remand for the limited purpose of allowing the juvenile court to comply with the notice provisions of the ICWA.

As discussed above, the ICWA notice the Agency sent did not include Mother's alias, Mary J. O[.], which Mother told the Agency was her legal name. Nor did the ICWA notice include the maiden names of S.B.'s maternal grandmother and maternal great-grandmother.

As set forth above, the Cherokee Nation's August 16, 2012 letter to the Agency provided a list of Mother's maternal relatives and included Mother's alias and the maiden names of S.B.'s maternal grandmother and maternal great-grandmother. The same letter lists S.B.'s great-great-grandmother as Edna M[.], a woman listed on the 1924 Baker Roll of the Eastern Band of Cherokee Indians of North Carolina. DCFS did not provide any of this additional information to the Eastern Band of Cherokee Indians or the United Keetoowah Band of Cherokee Indians and there is no indication in the record that these tribes were aware of any of this additional information when they made the decision they would not intervene in this matter. The letters from the Eastern Band of Cherokee Indians and the United Keetoowah Band of Cherokee Indians do not indicate these tribes were able to trace S.B.'s ancestry in the same manner as the Cherokee Nation.

"'[B]oth the federal ICWA regulations (25 C.F.R. § 23.11(d)(3) (2008)) and section 224.2, subdivision (a) require the agency to provide all known information concerning the child's parents, grandparents and great-grandparents . . . .' [Citation.] If known, names (maiden, married, former, and aliases), current and former addresses, birth dates, places of birth and death, tribal enrollment numbers, and any other information is to be provided. [Citation.] Notice given by DCFS pursuant to the ICWA must contain enough information to permit the tribe to conduct a meaningful review of its records to determine the child's eligibility for membership." (*In re S.E.* (2013) 217 Cal.App.4th 610, 614-615.) Under section 224.3, subdivision (a), the juvenile court and DCFS "have

15

an affirmative and continuing duty to inquire whether a child . . . is or may be an Indian child . . . ." The August 16, 2012 letter from the Cherokee Nation provided new information indicating S.B. may be eligible for membership in a tribe, given her maternal great-great-grandmother was listed on the 1924 Baker Roll of the Eastern Band of Cherokee Indians of North Carolina. (§ 224.3, subd. (b)(1) [there may be reason to know a child is an Indian child when a tribe "provides information suggesting the child is a member of a tribe or eligible for membership in a tribe or one or more of the child's biological parents, grandparents, or great-grandparents are or were a member of a tribe"].)

The juvenile court erred in finding DCFS complied with the notice requirements of the ICWA. We cannot find the error was harmless given DCFS did not notify the Eastern Band of Cherokee Indians that S.B.'s maternal great-great-grandmother was listed on the 1924 Baker Roll of the Eastern Band of Cherokee Indians of North Carolina, and there is no indication in the record that the Eastern Band of Cherokee Indians was otherwise aware of this information. (*In re Cheyanne F.* (2008) 164 Cal.App.4th 571, 576 ["where notice has been received by the tribe, as it undisputedly was in this case, errors or omissions in the notice are reviewed under the harmless error standard"].)

We conditionally reverse the order terminating parental rights and remand for the limited purpose of allowing the juvenile court to comply with the notice provisions of the ICWA. (*In re Francisco W.* (2006) 139 Cal.App.4th 695, 705.) The juvenile court shall direct DCFS to send a new ICWA notice (form ICWA-030) to the Eastern Band of Cherokee Indians and the United Keetoowah Band of Cherokee Indians. The notice must include Mother's alias (Mary J. O[.]), the maiden names of S.B.'s maternal grandmother and great-grandmother, information regarding Edna M[.]'s inclusion in the 1924 Baker Roll, and the list of other names, maiden names and aliases of S.B.'s relatives provided by the Cherokee Nation in its August 16, 2012 letter.

16

## DISPOSITION

The order terminating parental rights is conditionally reversed and the matter is remanded to the juvenile court with directions to order DCFS to send a new ICWA notice (form ICWA-030) to the Eastern Band of Cherokee Indians and the United Keetoowah Band of Cherokee Indians.  The notice must include Mother's alias (Mary J. O[.]), the maiden names of S.B.'s maternal grandmother and great-grandmother, information regarding Edna M[.]'s inclusion in the 1924 Baker Roll, and the list of other names, maiden names and aliases of S.B.'s relatives provided by the Cherokee Nation in its August 16, 2012 letter.  If, after receiving proper notice, no tribe indicates S.B. is an Indian child within the meaning of the ICWA, then the juvenile court shall reinstate the order terminating parental rights.  If, on the other hand, a tribe claims S.B. is an Indian child, the juvenile court shall proceed in conformity with the ICWA.

NOT TO BE PUBLISHED.


CHANEY, J.


We concur:


ROTHSCHILD, Acting P. J.


JOHNSON, J.

17